16 433
30a 390

## R. S. WILLIAMSON AND OTHERS v. JOHN J. SIMPSON'S EX'ORS.

Where the Court instructed the jury that the grant (from the Government) to plaintiff was *prima facie* evidence that all the prerequisites of the law, including the survey, had been complied with, and that the plaintiff was entitled to recover under it, unless it was void for want of certainty in the description of the land ; and the assignment of error was, in general terms, that the charge was erroneous, the Court said that the appellee (the defendant) might justly insist that the objection could not be made, in argument, that it appeared from the grant itself that the Commissioner who extended it, had no authority to do so. But, &c.

The presumption that the grantee of a colonial title was admitted as a colonist within the time prescribed by law, although the title be not extended until after the expiration of the contract, is of a nature so conclusive, that Courts would, after the lapse of twenty years, be very unwilling to admit, if they

did not absolutely exclude, all evidence to the contrary. But the point is immaterial in this case.

The contract of Vehlein was extended for three years by decree No. 192, (L. C. & T. p. 195,—from the 21st day of December, 1832.) This was a fact in the public history of the country, published among its laws, and which the Court was bound to notice, without averment or proof.

Where it was objected to a grant to a colonist of Vehlein's colony, extended by Commissioner George Antonio Nixon in 1835, that under Article 32, of Decree No. 272, (which Decree repealed all previous Decrees then in force,) the Commissioner was not empowered to issue titles to any but occupants of lands, and for the lands they occupied, and the proof was that the grantee did not reside on the land, the Court said, Without attempting to construe the provisions of Article 32, of Decree No. 272, (that not being necessary in this case,) it is sufficient to say that Nixon was not acting under that article, but as a Commissioner to issue titles to colonists in contracts made under the Colonization Law of the 24th March, 1825.

An inspection of the laws in relation to the public lands will show, that amidst all their repeals and modifications, no attempt at change was made or intended, in relation to contracts ratified under the law of 1825.

That George Antonio Nixon was a Commissioner for extending titles in Vehlein's Colony, is known to the Court, without averment or proof. Such proof, even if necessary, would, in this instance, have been wholly gratuitous, as the title was not questioned, at least at the trial, in this particular.

Notwithstanding the repeal of the Colonization Law of the 24th March, 1825, there is no doubt that it remained in force as to contracts made previous to its repeal, and that the other repealed decrees, affecting lands, remained in force so far as might be necessary to complete these contracts.

If a rigorous construction were given to the provisions of the law relative to the duties of surveyors, in running off land, and of the Commissioner, in obliging colonists to set landmarks upon their lands, with fixed and permanent boundaries, (Arts. 6 & 7 of Instructions to Commissioners, p. 71 L. C. & T.,) a grantee could not claim, unless under a survey actually made, and with permanent corners and boundaries. But such construction would be fraught with inconceivable mischief and calamity, and would be a departure from the rule adopted by other Courts in relation to similar statutes in other States, the condition of whose surveys and land titles were not dissimilar to our own.

There was no error in the instruction, to the effect that if a beginning corner on a navigable stream) be established, and the others could not be found, the plaintiff was entitled to a league, with the proper front on the river, the parallel lines being run back, from the points of such front, a sufficient depth to include the quantity.

There is no doubt of the rule, that where the calls of the grant can be established by the aid of extrinsic evidence, such evidence is admissible, and that it may be admitted for the correction of the mistakes of a surveyor.

Where the call was for a mound for a corner, from which was a walnut thirty inches in diameter to the south 70° east, at twenty varas distance, and an ash eighteen inches in diameter to the south 15° east, at eleven varas distance, and the original field notes described the corner as opposite to a notorious corner on the other side of the river ; and it appeared from the evidence, that a pecan and an ash were found some short distance below the place described by reference to the opposite survey, bearing the characteristic marks of witness, or bearing trees, facing in such a direction as to indicate the position of the corner as was fixed in the field notes ; and the surveyor testified that that was the actual corner which he established, having mistaken the pecan for a walnut ; but the ash, instead of being S. 15° E. 11 varas, was N. 62° W. 16 varas ; it was held that the evidence, in connection with some testimony as to the liability of a surveyor to make such mistakes, was competent to establish the corner, and that the finding of the jury showed it to have been sufficient.

Where one of the corners of a survey on a navigable stream is well known in the neighborhood, a subsequent locator cannot claim priority on the ground that the call misdescribed the corner, and that the survey did not appear on the county map.

In order to sustain a plea of the Statute of Limitations of three years, the title or color of title, by *written* transfers, and the adverse possession, must concur for that period ; but there would be no necessity for a transfer, where the party claims by inheritance ; and possession held by several persons successively, in privity with each other, will be considered one possession.

It would make no difference as to the dates of the transfers, provided there was a chain of transfer, and there were three years possession subsequent to the actual date of the primary transfer. (That is, we presume, after adverse possession under title or color of title has commenced, the dates of subsequent transfers are not material ; but what is material is, that the possession continue to be held under the same title or color of title under which it was first claimed.)

Appeal from Polk.    Tried before the Hon. Peter W. Gray.

*H. N. & M. M. Potter*, for appellants.

*F. B. Sexton*, for appellees.

HEMPHILL, CH. J.   The first ground assumed by appellants, is, that there was error in so much of the charge as declares, in effect, that the title offered by plaintiff was *prima fac*

good, on its face, to vest the land in him ; the appellants in-
sisting the title is void from the evident want of authority in
Nixon, the Commissioner, who made the grant.    This ground
is not noticed in the full and elaborate argument of the appel-
lee.    Most probably he was not apprised that any such posi-
tion would be assumed.  The assignment of error, in the charge
of the Court, is general ; and if it be legal notice of any spe-
cial objection, it certainly was not of this, which does not ap-
pear to have been urged below.    The language of the Court,
in the charge, is, that the grant to plaintiff is *prima facie* evi-
dence that all the prerequisites of the law, including the sur-
vey, had been complied with, and the plaintiffs are entitled to
recover under it, unless it is void for want of certainty in the
description of the land, &c., evidently showing that the objec-
tion set up against the grant was not the want of authority in
the Commissioner, but of certainty in the survey.

The appellees might justly insist that this ground should not
be noticed, as it was not insisted on below, or sufficiently spe-
cified in the assignments of error ; but, as it has been relied
upon by appellants, I will consider briefly the points and facts
presented in the suggestion.

The substance of the objection is, that Vehlein's contract
being made in December, 1826, expired in December, 1832,
consequently prior to the grant to the plaintiff Simpson in
1834—1835.    But if this were admitted, it would not *per se*
affect the title.    The grantee may have attached himself to
the colony before the termination of the contract, and whe-
ther the title were issued prior or subsequent to that time is of
no consequence.    The title cannot be issued until the appoint-
ment of a Commissioner for that purpose, and this appointment
may be either before or after the end of the contract, at the
pleasure of the Government.    But it is said that no proof was
made of the time of the introduction of Simpson ; that, from
the evidence, this may be presumed to have been in 1834, and
that if there were any extension of the contract of Vehlein, it

should have been averred and proved, in order to sustain the plaintiff's title.

It is not necessary to reiterate, in this Opinion, the principle that the grant is, to say the least, *prima facie* evidence of the admission of the colonist at the time prescribed by law. The presumption is of a nature so conclusive, that Courts would, after the lapse of twenty years, be very unwilling to admit, if they did not absolutely exclude, all evidence to the contrary. (Byrne v. Fagan, *supra*.) But, in point of fact, the time of Simpson's introduction, whether before December, 1832, or in 1834, is perfectly immaterial. The contract of Vehlein was extended for three years by the Decree No. 192. (L. C. & T. p. 195.) This was a fact in the public history of the country, published among its laws, and which the Court was bound to notice without averment or proof.

But an inquiry is made into the authority of Nixon to act as Commissioner, and also as to the rule or law of his action. It is said that (Decree No. 16) the Colonization Law of the 24th March, 1825, was repealed by Decree 190, and this latter Decree as well as Decrees 62 and 128, were repealed by decree No. 272, as well as all instructions for commissioners, which were in conflict with the latter Decree, and, in effect, that if the Commissioner was acting under Art. 32, of Decree No. 272, he was not empowered to issue titles to any but occupants of lands, and for the lands they occupied, and the proof was that Simpson resided in Nacogdoches, and was not an occupant of the land. Without attempting to construe the provisions of Article 32, of Decree No. 272, (that not being necessary in this case,) it is sufficient to say, that Nixon was not acting under that article, but as a Commissioner to issue titles to colonists in contracts made under the Colonization Law of the 24th March, 1825. An inspection of the laws in relation to the public lands will show. that amidst all their repeals and modifications, no attempt at change was made or intended, in relation to contracts ratified under the law of 1825.

(Art. 16 of Decree 19 ; Art. 30, Decree No. 272.) It is possible that after the repeal of the law of 1825 by that of 1832, and the repeal of the latter by the Decree of 1834, the Executive may have had some doubt as to the terms and power to be delegated by a commission, and also the instructions to be given to Commissioners ; but these doubts are believed to have been solved, and the Commissioners were authorized and instructed to discharge their functions in the issue of titles, in all respects in accordance with the law of 1825 ; and copies of that law, a well as of the instructions to the Commissioners in 1827, together with copies of decrees 62, 128 and 190, accompanied, it is believed, the commission, and were intended as guides for the Commissioner. I have not before me any of the executive correspondence on this subject, except a portion of that pertaining to the commission of George W. Smyth, which was issued to fulfil the Article 32, of Decree No. 272, and with this commission was inclosed copies of the law of the 24th March, 1825, of the 2nd May, 1832, of Decree No. 128, another of Decree 62, and also of the instructions to Commissioners. If these were furnished a Commissioner under the Article 32 of the law of 1834, *a fortiori* would they be supplied to a Commissioner for colonization contracts, made under the law of 24th March, 1825? Nixon, who extended this title, was a colony commissioner. He acted notoriously in that official capacity. He issued in 1834 and 1835 nearly one thousand titles. (See report of John P. Borden, Comm'r Gen. Land Office, in 1840, p. 349, Appendix to Journals of 5th Congress.) His authority was not then, nor has it since been, questioned. There is a *prima facie*, if not a conclusive presumption of his authority. Certainly it was not incumbent on the plaintiff, in order to support his title, to introduce proof of the fact of a commission to Nixon, or that such commission was authorized by law. Such proof, if ever necessary, would, in this instance, have been wholly gratuitous, as the title was not questioned, at least at the trial, in this particular. Notwithstanding the

repeal of the colonization law of the 24th March, 1825, there is no doubt that it remained in force as to contracts made previous to its repeal, and that the other repealed decrees affecting lands, remained in force so far as might be necessary to complete these contracts. In the repealing law of 1834, the law of 1825 is expressly recognized as existing for some purposes. And in 1835, among nearly the last decrees of the State of Coahuila and Texas, viz : in decree 309 and 318, the benefits of the law of 1825 were extended to all persons residing in Texas, who had not previously received lands according to the colonization laws, and the instructions of the 4th September, 1827, were declared to be the guides for the Commissioner. There was no error in the charge, that the title of the plaintiff was *prima facie* valid.

The main question. and the only one of difficulty in the cause, is as to the identification of the land ; that is, whether its *locus* or boundaries can be shown consistent with (so far as the law requires such consistency,) the calls of the grant. The charge of the Court to the jury is a copious and lucid exposition of the law on this subject ; and that portion of the charge especially germain to the facts, is to the effect, that if the jury believed from the evidence, that the first corner of the survey called for in the grant was established on the river by the surveyor, or that the lower corner was established on the river, which were natural objects, and that they or either them have been identified by proof, and that the lines and other corners cannot be established, the plaintiff would be entitled, under the grant, to a league of land, running the line with the river from the corner so established, such a distance as would include a league by lines running back from those points parallel to each other for quantity ; or if both corners on the river were established, then the grant is valid for the metes and bounds, according to the calls, if they can be run consistently with the course and distance ; if not. the grant would be valid for a league, by running back parallel lines from said corners

for quantity. The jury found for the plaintiff, to the amount of a league of land, beginning at the lower corner as made by Hirams, and as surveyed by J. R. Johnson at the request of Simpson.

The effect of this finding is, that in the judgment of the jury the survey had been commenced by Hirams; that he had established the lower corner; that the lines and other corners called for by the grant could not be traced or established, and that the plaintiff was entitled to a league surveyed in a legal form from the lower corner, viz: as surveyed by J. R. Johnson. Mr. Hirams, upon whose survey the grant issued, was prevented by Indians from concluding his survey on the ground; and though, from his own and other testimony, there is a presumption that he also established the upper corner, yet the jury having in effect ignored all of his survey—at least, not found any of it—but the lower corner and lower line, the question as to the establishment or identification of the upper corner becomes immaterial. The survey of Johnson was as far as possible consistent with the calls of the grant, that is, commencing at the lower corner, it ran the entire distance of the lower line, then running twenty five hundred varas for the cross line—thus making the cross line, or front, equal to about one fourth of the depth—the survey was concluded by running the upper line parallel with the lower line, to the river.

The question is, admitting the lower corner to have been sufficiently identified, is the plaintiff entitled to recover, when the survey was not made in fact, but only by protraction and calculation. If a rigorous construction were given to the provisions of the law relative to the duties of Surveyors, in running off lands, and of the Commissioner, in obliging colonists to set land marks upon their lands, with fixed and permanent boundaries, (Arts. 6 & 7 of Instructions to Commissioners, p. 71 Laws of C. & T.) a grantee could not claim, unless under a survey actually made, and with permanent corners and boundaries. But such construction would be fraught with incon-

ceivable mischief and calamity, and would be a departure from the rule adopted by other Courts in relation to similar statutes in other States, the condition of whose surveys and land titles was not dissimilar to our own. In Newsom v. Pryor's Lessee, 7 Wheaton, 7, 5 Cond. 206, it is said by Marshall, Chief Justice, that the survey was not made in fact, but that after making a beginning corner, the surveyor made out and returned a plat, which he supposed would comprehend the land intended to be acquired. "It is now too late to question the validity "of grants made on such plats and certificates of survey. From "the extraordinary circumstances of the country, they were "frequent, and, in consequence of these circumstances, have "received the sanction of the Courts. An immense number of "titles, believed to be perfectly secure, depend upon the main- "tenance of such grants. The extent of the mischief which "would result from unsettling the principle, cannot be per- "ceived, and is certainly too great to be now encountered. The "patent must therefore be considered as if the survey had been "actually made." This language portrays, very graphically, the condition of (it is believed) a numerous class of land titles in this State, and the mischievous consequences which would result from holding a grant void because the survey was not fully completed, or all its lines and corners not established. There is as strong necessity for the adoption of the rule sustaining such grants in this State, as there was in Tennessee. The circumstances are as extraordinary and as imperious, and the same regard for the preservation of rights, the security of property, and the repose and quiet of titles, which induced the sanction of the rule in other States, will give it sanction in this State. (5 Monroe, 159.) There was no error in the instruction to the effect, that if a beginning corner be established, and the others could not be found, the plaintiff was entitled to a league, with the proper front on the river, the parallel lines being run back from the points of such front a sufficient depth to include the quantity.

The question, upon the evidence is, whether such corner was.

made, and identified, as found by the jury. The corner is described in the field notes as being directly opposite the lower corner of a seven league survey belonging to H. S. Prentiss, being a mound on the bank of the river, from which a large walnut tree bears S. 70 W., 20 varas distant, and an ash S. 15 E., 11 varas. It appears that a pecan and an ash were found some short distance below the corner of the Prentiss survey, having the characteristic marks of witness, or bearing trees, facing in such direction as to indicate the position of the corner, (especially from the pecan tree) as was fixed in the field notes. Mr. Hirams testifies that this was the actual corner as established in 1834 ; that he searched for and found it in 1840, at the request of the plaintiff to show him the lines of his grant ; that, at the time he established the corner he thought the pecan was a walnut, and did not discover his mistake until 1840 ; that the survey was made in the spring of the year ; that, at the time of making the corner, he thought it was directly opposite the lower corner of Prentiss' survey, which was then of public notoriety, and has been so ever since. There is no doubt of the rule, that where the calls of the grant can be established by the aid of extrinsic evidence, such evidence is admissible, and that it may be admitted for the correction of the mistakes of a surveyor. (1 Peters, C. C. R. 496.) It was abundantly proven, that a walnut might be very easily mistaken for a pecan, and, *e converso*, and especially in the spring of the year. This, as a fact, is well known to those who have knowledge of this class of trees, they being of the same family. That a surveyor, under the circumstances, might mistake the exact position of a corner on the opposite side of the river, can be very easily conceived.

But it is said, also, that there is a mistake as to the direction and distance of the ash tree from the corner ; that, by the field notes of Hirams, it is described as S. 15 E., 11 varas distant, whereas Mr. Johnson found it N. 62 W. 16 varas, or, as Mr. Johnson says, nearly reversive of the calls. Had it

been directly the reverse, the mistake could have been more easily accounted for, on the ground that the direction was taken from the tree to the corner, instead of from the corner to the tree. This was the mode pursued by one of the most scientific and accurate surveyors in the east, until otherwise directed by Major Henrie, the Surveyor General. It is admitted by Mr. Johnson, who is District Surveyor, that such a mistake might be made, though in this instance he would think it a careless one. It appears, upon the whole, that this corner was found near the lower corner of the Prentiss survey—a very notorious landmark; that although another corner was found a little above, yet there is no evidence that it answered the description of the corner in the grant; that, as Mr. Johnson testifies, the marks on the pecan and ash trees, both faced where the lower corner of the league should be, according to the calls or bearings in the field notes of the grant; that, from the pecan, he could always have found the corner of Simpson's land by the call for the Prentiss corner, but doubted whether he should have taken the pecan corner as the true one, without some explanation. Such explanations became very often necessary in identifying corners and lines. In a certain sense, extrinsic evidence is always necessary. Without that, it could not be known that the stream, for instance, was the Trinity river, or that the corner on the east side was a land mark of the Prentiss survey. The evidence to establish the lower corner of the grant was competent, and the finding of the jury shows it to have been sufficient.

It appears, also, from the evidence, that the Simpson grant was well known in the neighborhood; that it was delineated on the first county map, though not on those made afterwards. For what reason this was not done is not stated. It may have conflicted with other old surveys. But, had there been no evidence from witnesses who had long resided in the country, as to the notoriety of the claim, the very fact that it had not been located upon until 1847, would raise a strong presumption

of such notoriety. It is not to be conceived that river lands, in this age of enterprise and land scheming, would have been so long neglected, if in fact they were vacant, and had not been known to have been granted. This presumption would not hold on a frontier, where lands were inaccessible, but is very reasonable in the settlements, and where the titles to lands are more or less notorious.

The only remaining question is as to the plea of limitation of three years, set up by the defendants. To sustain this plea, the defendants must prove all the facts prescribed by the statute, as constituting the bar under the 15th Section. The possession must be taken under title or color of title; there must be a consecutive chain of transfer in writing from the sovereignty of the soil down to him in possession; and if the claim be under a headright, there must be a chain of transfer. As charged by the Court, there would be no necessity for a transfer, where the party claims by inheritance.

The defendants claim under three surveys on headrights— one for Jesse B. Irving, another for Vincent Harrison, and a third for Mary Harrison. The first was not transferred in writing until May, 1853; the second, until May, 1854; nor the third until May, 1854.

Of the two latter, there is said to have been previous verbal transfers. But this does not satisfy the statute. It recognises no link in the chain of title required by this Section, unless constituted by transfer in writing, and no cause of action accrues to the plaintiff, under this Section, until possession be taken under the circumstances specified in the Section. A possession taken without title from the government, cannot be attached to a title subsequently acquired. The possession held by several persons successively, in privity with each other, will be considered one possession so as to form the statutory bar; but, through the whole period, the possession must be held in conformity with the requirements of law. It must be taken under title and so held under the same title with

consecutive written transfers, otherwise it will not sustain the plea of the three years limitation. The transfer from the original claimants not being made three years prior to the suit, it becomes unnecessary to consider the question as to whether the possession could be held by a tenant, and also as to continuity of possession. It is scarcely necessary to add, that the principles above expressed are to be understood with reference to the specific provisions of the 15th Section, and that it would make no difference as to the dates of the transfers, provided there was a chain of transfer, and there were three years possession subsequent to the actual date of the primary transfer.

Judgment affirmed.